Filed 12/22/20  Y.V. v. Superior Court CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| Y.V.,<br><br>    Petitioner;<br><br>        v.<br><br>THE SUPERIOR COURT OF ORANGE COUNTY,<br><br>    Respondent;<br><br>ORANGE COUNTY SOCIAL SERVICES AGENCY et al.,<br><br>    Real Parties in Interest. | G059410<br><br>(Super. Ct. Nos. 18DP0544 & 18DP0544A)<br><br>O P I N I O N |

Original proceedings; petition for a writ of mandate to challenge orders of the Superior Court of Orange County, Antony C. Ufland, Judge.  Petition denied.

Martin Schwarz, Interim Public Defender, Seth Bank, Assistant Public Defender, and Brian Okamoto, Deputy Public Defender for Petitioner.

No appearance for Respondent.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel for Real Party in Interest.

Law Office of Harold LaFlamme and Hannah Gardner for the Minor.

* * *

INTRODUCTION

Y.V. (Mother) is the mother of now 14-year-old K.G. (the Child). In March 2019, the Child was taken into protective custody. The juvenile court held a 12-month review hearing after which the court found that the return of the Child to Mother would create a substantial risk of detriment to her safety, protection, or physical or emotional well-being within the meaning of section 366.21, subdivision (f) of the Welfare and Institutions Code. (All further statutory references are to the Welfare and Institutions Code unless otherwise specified.) The court terminated reunification services and set the matter for a permanency hearing under section 366.26.

Mother filed a petition for a writ of mandate challenging the juvenile court's orders. She argues the court erred by finding that the return of the Child to Mother would create a substantial risk of harm to the Child and by terminating reunification services. We deny the writ petition. Substantial evidence supports the court's substantial risk of detriment finding. The record shows Mother was offered reasonable services. Although her individual therapy sessions had not succeeded in resolving the issues that led to dependency jurisdiction and brought the Child into protective custody, the record does not show Mother's therapist was incompetent in rendering therapy services to Mother.

FACTS AND PROCEDURAL HISTORY

I.

THE JUVENILE COURT SUSTAINS THE JUVENILE DEPENDENCY PETITION; FOLLOWING THE
DISPOSITION HEARING, THE CHILD REMAINS PLACED WITH MOTHER.

In August 2018, the juvenile court sustained the dependency petition filed in May 2018 by the Orange County Social Services Agency (SSA) on behalf of the Child (the petition), alleging she came within the jurisdiction of the juvenile court under section 300, subdivision (b)(1) (failure to protect). As of the jurisdiction hearing, the Child was not detained. The following summarizes the allegations of the petition sustained by the juvenile court to which both Mother and M.G. (Father)[1] submitted.

Mother and Father failed to ensure that the Child, who has been diagnosed with cerebral palsy, autism, developmental delays, and a speech impairment, has obtained timely and appropriate medical care and attended medical appointments with orthopedic, gastroenterology, ophthalmology, and urology specialists and obtained a renal ultrasound. The Child is a Regional Center client and has an Individual Education Plan.

When Mother was questioned in May 2018, she confused her own medications with those belonging to the Child and was unable to easily access information about the Child's doctor. The Child's teeth were in need of dental care.

Mother and Father have a history of domestic violence. Mother's adult son reported that Mother and Father are "always engaging in physical fights"; Mother accuses Father of cheating on her and hits him and sometimes Father hits back. Mother's adult son reported that Mother and Father fight in front of the Child and on May 23, 2018, Mother slapped Father during an argument causing the Child to cry. Father reported that Mother had hit him, but denied that he hit her.

---

[1] Father, who is the Child's alleged father but is not her biological father, is not a party to this writ proceeding and it appears from our record that, for most of the dependency proceedings, he did not live with Mother and the Child. Our references to Father in this opinion are limited to providing relevant context for Mother's arguments.

3

The petition alleged that Mother may have an undiagnosed and untreated mental health condition. Her adult son reported Mother says things that do not make sense and are not realistic. For example, Mother has stated she has an appointment with Donald Trump to get her passport. In November 2017, Mother went to a police station to ask that a letter be sent to the President of the United States requesting an investigation due to Mother being harassed and physically assaulted. "At that time the [M]other claimed that she almost got food poisoning, [had] been run over by a car, and had a drink thrown at her in 2013, suspecting that people she used to live with tried to harm her." On May 26, 2018, Mother was observed to have erratic behavior, scattered thoughts, and irrational ideas. Father reported that Mother is happy one moment and then suddenly starts screaming at him, accusing him of being with other women.

Although Father is not the Child's biological father, he has treated her as if she were. The identity of the Child's biological father is unknown as is his ability to provide for her safety, protection, and support or to arrange for appropriate care for her.

Father has a history of substance abuse evidenced by criminal convictions for driving under the influence of alcohol and/or drugs. Father has a criminal history of arrests and/or convictions for driving under the influence, driving on a suspended or revoked license, refusing a chemical test, failing to stop at a stop sign, and driving without a license.

Finally, the petition alleged Mother also has a criminal history which involves arrests and/or convictions for driving without a license, failing to register a vehicle, failing to provide proof of financial responsibility, hit and run with property damage, and driving under the influence of alcohol or drugs.

Following the disposition hearing, in accordance with SSA's recommendations, in October 2018, the juvenile court declared the Child a dependent child of the Orange County Juvenile Court under section 360, subdivision (d), and

4

ordered that she remained placed with Mother and Father and that family maintenance services be provided to the family.

II.

THE JUVENILE COURT GRANTS SSA'S APPLICATION FOR A PROTECTIVE CUSTODY WARRANT AND DECLARATION SEEKING REMOVAL OF THE CHILD FROM MOTHER AND FATHER'S CARE.

In March 2019, SSA filed a protective custody warrant application and declaration for the removal of the Child from Mother and Father's care. The application stated Mother "has failed to comply with several medical appointments to address the child's ongoing medical needs. The child was left under the care of the parents with a Family Maintenance case plan. Under the parent's case plan, the parents are ordered to keep all medical and dental appointments on behalf of the child. The mother admitted to missing the child's recent appointments for Ophthalmology on February 27, 2019 and Orthopedics on March 8, 2019. Due to the mother's missing the child's Orthopedic appointment the child has not been provided with the adequate medical equipment through CSS program. PHN Forrest spoke with the child's pediatrician Dr. Currie on March 15, 2019 which she reported that the child is considered failure to thrive. The mother continues to show a pattern of lack of follow through with the child's medical appointment prior and during her Family Maintenance Case. According to the PHN the child has missed appointments for the following specialists: diagnostic ultrasound for Vesicoureteral Reflux, ophthalmology, orthopedic, PT/OT, and ENT for hearing test."

The application also described an incident that occurred on March 19, 2019 during which the Child injured her right eye: "The mother reported to her roommate . . . that the child fell and received the injury to her eye. [The roommate] stated that after questioning the mother on the child's injury that the mother changed her story and stated that the child rubbed her face with a Mr. Clean sponge causing the injury to her eye. The mother reported leaving the child unsupervised for an unknown amount

5

of time in the shower which places the child who has special needs at risk of injury. At this time the undersigned, [the social workers] are not able to determine[] how the child's injury was caused due to the child's inability to communicate verbally."

The application stated SSA consulted with a child abuse expert regarding the Child's injury and the expert was unable to determine, based on the information provided, whether the Child or Mother caused the Child's injury. The expert stated, "regardless of the reason why, the mother is not following through with medical recommendations, whether deliberate or due to her psychiatric condition, that the child's health is at risk."

The application reported that Mother complied with the court's order to submit to a forensic psychological evaluation by Dr. Roberto Flores de Apodaca who diagnosed Mother with "Unspecified Psychotic Disorder." Dr. Flores de Apodaca stated that Mother's diagnosis constituted a significant risk factor for her well-being and ability to parent. The application asserted Mother refused to seek mental health services because she did not believe she had a mental health issue. Nevertheless, Dr. Flores de Apodaca stated that it would be possible for mental health treatment to improve her psychosis.

The application concluded: "Due to the mother's unresolved mental health issues and lack of follow through with the child's medical appointments, the undersigned believes that the child if left in the care of the mother is a[t] substantial risk for further abuse or neglect. Therefore, the undersigned respectfully requests that custody be removed from the [Mother] and [Father]."[2]

The juvenile court granted SSA's application, finding that the Child remaining in Mother's home was contrary to the Child's welfare. The Child was detained.

---

[2] The application for a protective order also cited Mother's refusal to submit to drug testing.

## III.

### THE JUVENILE COURT SUSTAINS SSA'S SUPPLEMENTAL PETITION.

In March 2019, SSA filed a supplemental petition for more restrictive placement (the supplemental petition). As relevant to the issues in this writ proceeding, the supplemental petition alleged that the then-current court-ordered case plan for Mother included that she (1) comply with medical or psychological treatment; (2) demonstrate adequate knowledge of the Child's special needs; (3) demonstrate an ability to provide, or obtain any specialized care the Child required such as medical, dental, and developmental services; (4) attend all specialty medical and developmental service appointments promptly and appropriately to learn to care for the Child's individual needs; (5) refrain from behaving in a manner that is verbally, emotionally, or physically abusive or threatening; (6) show her ability to provide adequate care for the Child's special needs; (7) inform the assigned social worker of any difficulties in completing the case plan as soon as they occur to allow the assigned social worker the opportunity to provide assistance in finding ways to overcome said difficulties; (8) participate in individual, conjoint, family, and/or group therapy with a therapist approved by SSA to address domestic violence, the Child's special needs, and how the Child's daily needs are met; and (9) comply with a mental health evaluation including attending mental health and/or psychiatric appointments.

The supplemental petition alleged that although Mother had been receiving services since March 2018, and despite the juvenile court's and SSA's supervision, Mother continued to fail to meet the Child's medical and developmental needs. Mother missed a diagnostic ultrasound for Vesicoureteral Reflux that was scheduled for the Child. The Child missed appointments with specialists in the fields of ophthalmology, orthopedics, and physical and/or occupational therapy, and also missed a hearing test.

The supplemental petition alleged that in September 2018, Mother was assigned a case manager through the Child's health plan to assist her in managing the

7

Child's various medical needs. Mother's case, however, was closed because she failed to return the case manager's multiple calls. Mother blamed missing appointments on not having financial means or transportation; Mother had been provided with a bus pass and information on how to use ACCESS transportation for the Child.

The supplemental petition stated Mother reported the Child did not require as much medical care because a doctor told her she was doing such a good job caring for the Child and the Child did not need to attend as many appointments. When the Child was diagnosed as failing to thrive, PediaSure was prescribed to supplement her diet. Mother, however, reported she did not give the Child the prescribed PediaSure because the Child did not like the flavor although an observer who is not identified in the supplemental petition noted that "when the bottle was held out, the child reached for and drank the Pedia[S]ure." The supplemental petition stated: "Competent medical opinion is that, [Mother], has not been following through with the medical recommendations for the [C]hild, and whether [Mother]'s actions are deliberate or due to a psychiatric condition, the [Mother]'s actions have put the [C]hild's health at risk."

The supplemental petition further alleged that in January 2019, Mother participated in a court-ordered Evidence Code section 730 evaluation in which Mother was diagnosed with nonspecific psychotic disorder. During her evaluation, Mother reiterated several delusional and paranoid statements and stated she refused to seek mental health treatment because she did not believe she had a mental health issue. The supplemental petition alleged Mother's "prospects for participating meaningfully in any treatment programming recommended for her are guarded. The mother maintains that there are no problems with her care of the child and that her situation is the fault of a social worker from 2015."

With regard to the Child's eye injury, the supplemental petition alleged that the Child was observed to cry and needed to be calmed and at one point, pointed to her eye and closed her fist. Mother's roommate expressed concern that Mother may have

8

struck the Child and stated her concern was based on how the Child responded to the roommate's questions and the roommate having previously observed Mother slap the Child's face. The roommate reported that Mother told her that the Child had fallen and injured her eye but, during the investigation, Mother reported that the Child was injured after she rubbed her eye with a white "magic eraser" sponge intended for cleaning tile when Mother briefly left the child unattended in the shower. Mother stated that the roommate had instructed her to use the sponge to wash the child; the roommate stated she gave the sponge to Mother for household cleaning. According to medical personnel, the injury appeared consistent with a friction burn that could have been caused by the sponge and if that is what had occurred, it could not be determined if it was Mother or the Child who rubbed the Child's face with the sponge.

The roommate and another person who had lived in the home expressed concern about Mother's care and supervision of the Child, as they had observed Mother exhibiting bizarre behavior, including Mother's failure to change the Child's diaper for extended periods of time.

In addition, the supplemental petition alleged Mother had not complied with court-ordered testing by refusing to drug test and failing to provide proof of attendance at 12-step meetings.

After Mother and Father submitted on the supplemental petition, the juvenile court sustained it, finding the allegations of the supplemental petition true by a preponderance of the evidence. The court re-appointed Dr. Roberto Flores de Apodaca to complete an updated assessment of Mother regarding the applicability of section 361.5, subdivision (b)(2).

## IV.

### SSA FILES FOUR REPORTS LEADING UP TO THE CONTESTED 12-MONTH REVIEW HEARING.[3]

In its status review report dated March 30, 2020 and addendum report no. 1 in May 2020, SSA recommended that the juvenile court order the continued provision of reunification services to Mother. In the former report, SSA asserted Mother's cooperation in the case plan had been minimal. Mother stated she had completed some parenting classes, but she had initially refused to sign a counseling referral because she disputed the statement the Child was removed from her care due to physical abuse.

In addendum report no. 1, the social worker reported that Mother had begun receiving telehealth services via video chatting with Jane Canseco, LSCP. As of mid-April 2020, Canseco had met with Mother three or four times and found Mother to be "very likeable." Canseco observed Mother to be "lacking education and 'in need of a lot of parenting.'" She could not say whether the Child would be safe in Mother's care without observing the Child with Mother.

Canseco reported Mother demonstrated little insight into the issues requiring SSA interventions. Mother had expressed closely-held feelings of being persecuted and of distrust toward SSA, the juvenile court, and the police; Canseco stated Mother's lack of insight and distrust of those entities were "recurring themes impeding her progress." Canseco stated there was hope Mother may make progress if she "accept[s] process instead of defending against it."

---

[3] In its opposition to the petition for writ of mandate, County Counsel explains: "Given that [the Child] was initially removed from Mother in March 2019, the review hearing here took place almost 18 months after the child entered foster care per section 361.49. As a result, the hearing was a 12-month review per section 366.21, subdivision (f), with those provisions applying despite no six-month review having taken place beforehand. (See *Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 846-847; *Jessica A. v. Superior Court* (2004) 124 Cal.App.4th 636, 645.)"

The social worker also reported that, in April 2020, Mother objected to the Child receiving a planned haircut and stated she would e-mail Xavier Becerra to inform him of "all the corruptions and felonies that the social workers have committed." She also stated she would "have an investigation open" on Father because "he has been the one who has been hallucinating and assaulting her in the past."

In its addendum report no. 2 in June 2020, SSA changed its recommendation from continuing reunification services to terminating them and scheduling a permanency hearing. In that report, the social worker concluded Mother's progress in counseling was "not significant enough due to the mother continuing to display paranoid delusions and still lacking insight into her own mental health issues. These delusions have been expressed by the mother during visits and will, no doubt, have an effect on the child. Although the mother completed 4 out of the 6 parenting classes and [was] given a certificate of completion in the past, the mother still demonstrates poor judgment when relating to others, as observed in her video calls with the child by being distracted with other adults and children during her video calls and making critical statements regarding the child's hair cut in the presence of the child. According to her therapist, the mother continues to report some paranoid and delusional thoughts, which she has done consistently throughout the life of this case. [Mother] has no insight into her own mental health needs and has denied a need for mental health treatment to address these concerns."

The social worker cited Mother's statements that she planned to contact the FBI to report Father for having assaulted and threatened her in the past and claimed she had videos of him threatening her. Although Mother reportedly had a good attendance record and positive attitude in therapy sessions, was making some progress working toward treatment goals, and expressed "extraordinary care" with regard to the Child, Canseco acknowledged Mother "perseverates" on a notion and gets stuck there, but believed she could be coached and taught.

11

Mother continued to express paranoid statements during visits with the Child, including obsessing regarding the length of the Child's bangs, complaining that she is being followed, and sharing her plans to hire a detective to "get all the people who have committed felonies when removing her child." Mother missed a visit with the Child because she desired to fly to Washington, D.C. to meet with the President about her case.

The social worker also cited Dr. Flores de Apodaca's Evidence Code section 730 evaluation report from January 2019 in which he opined: "'[M]other's unspecified Psychotic Disorder (298.90) is a significant risk factor for her wellbeing and parenting abilities going forward.'" He further stated: "I do not think it clinically likely probable that Mother will come to the realization that she has unwarranted paranoia anytime in the foreseeable future. She has apparently harbored these ideas for [several] months and is uninsightful about them. She does not trust Social Services and there is no compelling clinical reason for believing this is going to change spontaneously or even with the help of counseling. There is a possibility that treatment with medications may help and so it is certainly warranted that she be evaluated for such treatment. Paranoia is highly resistant to treatments of all kinds, including medication, but it does offer some hope for clinical efficacy."

The social worker further noted that family maintenance efforts failed in March 2019 due to concerns regarding Mother's mental health after the Child's eye injury and numerous missed appointments.

In its addendum report no. 3 in August 2020, the social worker reiterated SSA's recommendation to terminate reunification services and schedule a permanency hearing. The social worker reported Mother continued to take parenting classes and continued receiving therapy services from Canseco. Canseco stated that Mother had made significant progress toward the goals established in individual therapy including "the use of appropriate discipline and parenting skills; knowledge and provision of timely

medical, dental, and educational services; and the acquisition and demonstration of protection and safety skills related to domestic violence."

Canseco stated Mother reported the use of "tried and true" parenting skills including the use of positive reinforcement, distraction, positive modeling, and consistent forms of limit setting she learned through parent education at the Regional Center, in other classes, and in individual therapy. Canseco stated Mother acknowledges the inappropriateness of corporal punishment and appears conscientious about verifying, participating and attending medical, dental, and educational appointments for her child, based on her reports and the social worker's reports. Canseco stated: "[Mother] reports a healthy understanding of the dangers of domestic violence for herself and her child. Additionally, she staunchly states that her self-worth would not allow her to stay with anyone who would show her abuse and disrespect. At no time during our sessions has [Mother] presented any behaviors or verbalizations that raise any concerns about the presence of delusions, hallucinations, thought disorders, or other psychotic behaviors."

Canseco reported to the social worker that she had not observed Mother experiencing any delusions or hallucinations in her counseling sessions and stated that Mother exhibiting delusional thinking does not automatically mean she has a psychotic disorder. Canseco clarified she was not asserting that Dr. Flores de Apodaca's Evidence Code section 730 evaluation conclusion was incorrect, but that she herself had not seen Mother display symptoms of unspecified psychotic disorder.

V.

FOLLOWING THE CONTESTED 12-MONTH REVIEW HEARING, THE JUVENILE COURT FINDS THERE IS A SUBSTANTIAL RISK OF DETRIMENT TO THE CHILD IF SHE WERE RETURNED TO MOTHER, TERMINATES REUNIFICATION SERVICES, AND SETS A PERMANENCY HEARING.

At the 12-month contested review hearing held in September 2020, the juvenile court admitted into evidence the March 30, 2020 status review report and the three addendum reports. The social worker assigned to this case testified that Mother's

13

case plan consisted of completing a parenting class, demonstrating parenting skills, completing and making progress in counseling to address the issues that brought the family to the attention of SSA, and taking medication if needed. Mother completed two parenting programs and continued to attend individual counseling with Canseco that she began in March 2020; Mother had previously participated in individual counseling with a different therapist.

The social worker testified she referred Mother to community resources that offer mental health services and Mother contacted those resources. The social worker testified that she did not believe the Child could be safely returned to Mother's care within 18 months of the date she was removed from Mother's custody.

Canseco also testified at the hearing. She stated Mother virtually participated in weekly therapy sessions lasting 45 to 60 minutes each and had "exceptional" attendance as she attended about 18 sessions to date. She testified the goals of therapy were to address her domestic violence history and its impact on Mother and the Child; parenting skills in reference to neglect and/or optimal parenting for the Child; and appropriate provision of medical and dental care for the Child. She testified about Mother's progress in working toward addressing each of the goals. She also saw in Mother "symptomology of delusional thoughts" but thought those symptoms would not interfere with her daily living activities. Canseco was not directed to address symptoms of Mother's mental health diagnosis. Mother did not tell Canseco she believed Father had people following Mother. Mother told Canseco that the reason SSA is involved in her life is because she failed to obtain proper treatment for the Child's dental issues and because someone made an anonymous call stating that she had abused or neglected the Child because there had been a mark on the Child's face.

Canseco testified Mother did not tell her about Mother being the aggressor in a domestic violence situation, did not take responsibility for failing to provide for the

14

Child's medical needs but explained the problems she faced in meeting those needs, and never acknowledged slapping the Child.

Mother did not tell Canseco about contacting the FBI, Father stalking Mother, or about needing the President's assistance to help her get her passport and to make certain complaints because she wants the Child back in her care. Canseco testified Mother expressed the delusional thought that the County does not want Mother to have the Child back in her care. Mother told Canseco she went to Washington, D.C., but Canseco could not say whether that statement reflected a delusion because she did not know if it was true. Canseco testified that Mother's recurring feelings in therapy about being persecuted by SSA and her minimizing the importance of letting those feelings go has impeded her ability to focus on the goals of therapy. Canseco was unaware the Child had to have multiple teeth extracted because they were rotted to the extent they could not be saved. Canseco testified that as a professional, she trusted Dr. Flores de Apodaca's reporting, but based on her time with Mother, she did not reach the same conclusion he did that Mother met the diagnostic criteria for psychosis not otherwise specified.

During argument, the Child's counsel stated: "We would join with the County and ask that the court terminate services and keep [the Child] out of Mother's home." Father's counsel stated Father would "submit[] to the recommendation" of SSA and join in County Counsel's and Minor's counsel's arguments regarding Mother.

The juvenile court found by a preponderance of the evidence that return of the Child to Mother and Father would create a substantial risk of detriment to her safety, protection, or physical or emotional well-being. The court further found that reasonable services had been offered to Mother and Father and that Mother's progress towards alleviating or mitigating the causes necessitating placement had been minimal. The court ordered reunification services terminated for Mother and Father and set the matter for a permanency hearing.

Mother filed the instant petition for writ of mandate challenging the juvenile court's orders. This court issued an order to show cause. Both County Counsel and the Child's counsel responded, opposing issuance of a writ.

DISCUSSION

I.

SUBSTANTIAL EVIDENCE SUPPORTS THE JUVENILE COURT'S RISK OF SUBSTANTIAL DETRIMENT FINDING.

Mother contends substantial evidence does not support the juvenile court's finding that returning the Child to her custody would create a substantial risk of detriment to the Child. At a 12-month review hearing, the juvenile court must return a child to parental custody "unless the court finds, by a preponderance of the evidence, that the return of the child . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (f)(1).) A parent's failure to participate regularly and make substantial progress in court-ordered treatment programs is prima facie evidence that return of the child to the parent's care would be detrimental. (§ 321.21, subd. (f)(1)(B).)

At the 12-month review hearing, the focus is the child's well-being at the time of the hearing rather than on the initial basis for juvenile court intervention. (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 899.) "Thus, while the court must consider the extent the parent has cooperated with the services provided and the efforts the parent has made to correct the problems which gave rise to the dependency [citation], the decision whether to return the child to parental custody depends on the effect that action would have on the physical or emotional well-being of the child." (*Ibid.*)

We review the juvenile court's factual findings, such as the finding of risk of detriment, under the substantial evidence standard. (*Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1345-1346; *Jennifer A. v. Superior Court* (2004)

16

117 Cal.App.4th 1322, 1341.) "Under that standard we inquire whether the evidence, contradicted or uncontradicted, supports the court's determination. We resolve all conflicts in support of the determination, indulge in all legitimate inferences to uphold the findings and may not substitute our deductions for those of the juvenile court. [Citations.] However, '[s]ubstantial evidence is not synonymous with any evidence. [Citation.] To be substantial, the evidence must be of ponderable legal significance and must be reasonable in nature, credible, and of solid value.'" (*Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 865.) The juvenile court assesses the credibility of witnesses, and we are bound by its credibility determinations. (*In re S.P.* (2020) 53 Cal.App.5th 13, 18-19; *In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

Substantial evidence supports the court's finding that return of the Child to Mother would create a substantial risk of detriment to the Child's safety, protection, or physical or emotional well-being. The Child has significant special needs which necessitate her attendance at a host of medical specialists' appointments. Dependency jurisdiction was asserted in this case in part due to Mother's failure to manage the Child's medical needs and ensure the Child attended all such appointments. The Child was not removed from Mother's care at that time; the Child remained with Mother on a family maintenance plan. Substantial evidence shows that Mother continued to fail to manage the Child's medical needs even while receiving family maintenance services. Mother's failure to follow through with attending medical appointments and following directives (e.g., making sure the Child took the prescribed PediaSure after concerns about her failure to thrive) coupled with, inter alia, the unconfirmed cause of the Child's eye injury triggered the juvenile court to grant SSA's application to take the Child into protective custody.

The record shows that after the Evidence Code section 730 evaluation, Mother was diagnosed with nonspecific psychotic disorder which may negatively affect her ability to parent the Child and address her special needs. The record shows Mother

17

has cooperated in therapy with Canseco, but persists in paranoia and delusions that have impeded therapy to some point. In her writ petition, Mother argues substantial evidence does not show a sufficient nexus between Mother's mental health issues and her ability to parent the Child. Whether or not her nonspecific psychosis is to blame, in whole or in part, for her inability to meet the Child's medical needs and otherwise care for her, substantial evidence supports the juvenile court's finding that Mother was unable to handle that heavy responsibility and returning the Child to Mother's care, therefore, posed a substantial risk of detriment to the Child.

To the extent Mother suggests that her efforts to complete parenting classes and participate in several therapy sessions with Canseco should automatically result in the Child being returned to her, that is not the law. As stated in *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1143: "As we have already stressed, simply complying with the reunification plan by attending the required therapy sessions and visiting the children is to be considered by the court; but it is not determinative. The court must also consider the parents' progress and their capacity to meet the objectives of the plan; otherwise the reasons for removing the children out-of-home will not have been ameliorated."

II.

MOTHER WAS OFFERED REASONABLE REUNIFICATION SERVICES.

At the 12-month review hearing, the juvenile court found by clear and convincing evidence that reasonable services had been provided or offered to Mother. Whenever a child is removed from a parent's custody, the juvenile court must order provision of child welfare services to the parent deemed eligible for reunification services. (§ 361.5, subd. (a).) Section 361.5 requires a good faith effort to provide reasonable services "'specifically tailored to fit the circumstances of each family'" and "'designed to eliminate those conditions which led to the juvenile court's jurisdictional finding.'" (*In re Precious J.* (1996) 42 Cal.App.4th 1463, 1472, 1474.)

18

The juvenile court's finding that reasonable reunification services had been offered or provided is reviewed under the substantial evidence standard. (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971.) A finding by the juvenile court that reasonable services have been provided must be made on clear and convincing evidence. (*Ibid.*) "[W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996.)

"[I]n reviewing the reasonableness of the reunification services provided by the Department, we must also recognize that in most cases more services might have been provided, and the services which are provided are often imperfect. The standard is not whether the services provided were the best that might have been provided, but whether they were reasonable under the circumstances." (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.)

In her writ petition, Mother acknowledges she was offered services. She participated in two parenting programs, two rounds of counseling with two therapists, and submitted to two Evidence Code section 730 evaluations with Dr. Flores de Apodaca. Mother argues she was not offered reasonable services because the therapy she received from Canseco was deficient and SSA failed to provide "a replacement counselor or an alternative service." Her argument is based on arguments made by SSA and the Child's counsel at the 12-month review hearing which Mother argues rejected Canseco's "positive assessments of Mother and heavily criticized Canseco's competence."

19

The record does not show, however, that SSA argued Canseco was incompetent in providing therapy services to Mother or that she was otherwise unqualified to render such services. To the contrary, in its addendum reports admitted into evidence at the 12-month review hearing, SSA cited Canseco's statements about Mother's progress in therapy. The record shows SSA did not question Canseco's competence. Instead, SSA disagreed with the substance of her testimony which suggested that Mother had met all of the goals of therapy and had resolved the issues that led to the Child becoming a dependent child and being taken into protective custody.

County Counsel argued: "So far as [Mother's counsel]'s suggestion that we could not find someone to treat mom, she's right. We found someone to offer treatment. We found a number of people to offer treatment, but as Dr. [Flores de] Apodaca predicted, those professionals were unable to give mom the treatment that would be needed to fix her. Again, not out of failure because we did offer and provide people that were providing treatment, but as a far as a fix, you're right. We didn't find that fix, but she can't fault us for that because we did everything we could in trying to address the numerous problems that mom has."

The juvenile court found Canseco's testimony to lack credibility and that the therapy had not successfully resolved Mother's issues for a variety of reasons, including decisions made by Canseco the court disagreed with; the court did not state it found Canseco to have rendered incompetent therapy services. At the hearing, the court stated: "Largely, this hearing centers around the information that is provided by the counselor, the therapist Miss Canseco and what the value of that counseling, what that therapy was, the outcome of that therapy was. I think there was a failure in that therapy. Part of that failure with the therapy is as a result of Mother's failing to engage with the therapist in things that were accurate about the case, about her history, about the issues as they really do exist.

20

"Domestic violence and her involvement as an aggressor. Physical abuse and her involvement as a proponent of physical abuse towards the child. All of those things. And part of it is the fault of the therapist, who had that information at her disposal in the [Evidence Code section] 730, in the reports, detailed specific items of delusional thoughts and chose to ignore them with the mother.

"I understand from Miss Canseco that her therapy, her approach is not to challenge an individual's delusional thoughts because you end up becoming part of the individual's delusion and the conspiracy against them. I understand that concern, but I don't believe that it—in this case that it was helpful to completely ignore them. They need to be discussed. They need to be addressed with the individual mother and not just ignored and that's what I think happened here.

"I think Miss Canseco did not give any attention to the specific—very specific information that was detailed in Dr. Flores de Apodaca's report, in the social worker's reports and really address that. Address Mom's mental health history. I don't know if it was a bias on the part of the counselor. I can't necessarily say that. She definitely had a position and a belief with regard to how her sessions with Mother were.

"I do note a lack of what I would describe as forthright answering from the therapist to certain questions. Answers that weren't necessarily entirely responsive to the question. I don't believe that—I don't believe—I can't say that it came, necessarily, from a bias, but I did note in her testimony specifically today that the therapist didn't want to answer the questions that were asked.

"Specifically, there was a question, did you consider . . . Dr. Flores de Apodaca's concerns? And the answer was, I consider x, y and z, never addressing whether or not she considered Dr. Flores de Apodaca's concerns. That's just an example of the types of answers where she was touching on answering a question, but answering it in a completely different way, in not offering information that was entirely responsive to the question that was being asked.

21

"It was definitely an agenda and a direction that Miss Canseco wanted to go with her answers, but the problem—and I think that she eventually had to even land on it—was that she was operating with incomplete information. Things that Mother didn't share with her. And so it's lack of information—bad information in, bad information out. You can't have an accurate, appropriate recommendation or diagnosis if you are not getting the necessary information in. Data in. And part of that, as I said, is on Mother for not sharing that and part of that is on Miss Canseco for having it there and not doing anything to bring that out on her own."

Services need to be reasonable under the circumstances. As detailed *ante*, Mother was provided extensive services over a substantial period of time. As explained by the court, the therapy provided by Canseco in particular was imperfect. But services need to be reasonable; perfection is not the standard. The court's finding Mother was offered reasonable services is amply supported by the record.

## DISPOSITION

The petition is denied.

                                                            FYBEL, J.

WE CONCUR:


MOORE, ACTING P. J.


ARONSON, J.

22